The CINCINNATI GAS & ELECTRIC COMPANY et al., Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent,

The City of Hamilton, Ohio and Texas Gas Transmission Corp., Intervenors.

The OHIO FUEL GAS COMPANY et al., Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent.

Nos. 17888, 17939.

United States Court of Appeals Sixth Circuit.

Feb. 16, 1968.

Walter E. Beckjord and Paul J. Doppes, Cincinnati, Ohio, for petitioners The Cincinnati Gas & Electric Co. and the City of Cincinnati; Peck, Shaffer & Williams, Cincinnati, Ohio, on the brief.

R. N. Mahaffey, Columbus, Ohio, for petitioners Ohio Fuel Gas Co. and Kentucky Gas Transmission Corp.; J. F. Sisson, New York City, C. E. Goodwin, H. Raymond Andrews, Jr., Charleston, W. Va., William C. Hart, Washington, D. C., on the brief.

Joel Yohalem, Atty., Federal Power Commission, Washington, D. C., for respondent; Richard A. Solomon, Gen. Counsel, Peter H. Schiff, Solicitor, Edward Berlin, Asst. Gen. Counsel, Washington, D. C., on the brief.

J. David Mann, Jr., Washington, D. C., for intervenor The City of Hamilton, Ohio; Robert A. Peavey, Washington, D. C., on brief; Morgan, Lewis & Bockius, Philadelphia, Pa.-Washington, D. C., of counsel.

George J. Meiburger, Washington, D. C., for intervenor Texas Gas Transmission Corp.; Christopher T. Boland, Thomas F. Brosnan, Gallagher, Connor & Boland, Washington, D. C., on brief; Robert O. Koch, Texas Gas Transmission Corp., Owensboro, Ky., of counsel.

Before WEICK, Chief Judge, and O'SULLIVAN and PHILLIPS, Circuit Judges.

WEICK, Chief Judge.

These proceedings are to review orders of the Federal Power Commission authorizing the City of Hamilton, Ohio, to change from its present natural gas supplier, The Cincinnati Gas & Electric Company (CG&E), to another supplier, Texas Gas Transmission Corporation (Texas), whose main transmission system passes within the city limits of Hamilton.

The basis for the orders was that Texas would supply the gas to Hamilton at a substantially lower rate than CG&E, and that the benefits derived by Hamilton from the change in suppliers outweighed, in the public interest, any adverse impact on CG&E, its customers and suppliers, occasioned by the loss of Hamilton as a customer.

The City of Hamilton from its municipally owned plant distributes gas to more than 20,000 customers in an area embracing approximately 79,000 people, located about twenty miles north of Cincinnati. Since 1937 it has obtained all of its supply of gas from CG&E, also a distributor, which in turn is supplied by The Ohio Fuel Gas Company (Ohio Fuel) and Kentucky Gas Transmission Corporation (KGT), both Columbia System Companies. The sale of gas by CG&E to Hamilton is not regulated by the Commission as CG&E was granted a "Hinshaw" exemption under Section 1(c) of the Natural Gas Act (15 U.S.C. § 717(c)) in 1955.[1] 14 F.P.C. 534. The sale of gas from CG&E to Hamilton was not regulated by the Public Utilities Commission of Ohio.

Hamilton's service contract with CG&E expired on September 3, 1966, but has been continued on an interim basis pending a resolution of the controversy.

Hamilton is CG&E's only wholesale customer, and constitutes 5% of its market, purchasing about 4,500,000 Mcf annually.

Hamilton investigated alternate sources of supply in order to obtain the most economical service available.

After giving notice to CG&E of termination of its contract, Hamilton negotiated a new twenty-year service contract with Texas, which would be subject to regulation by the Commission. Texas agreed to supply gas under its G-4 rate schedule, which had a demand charges of $2.71 per Mcf and 22.22¢ per Mcf commodity charge.[2] The demand charge was later reduced by order of the Commission to $2.53 per Mcf. At the termination of the contract CG&E's rate was $2.3249 demand and 35.5¢ per Mcf commodity charge.

CG&E made several offers during the course of the proceedings to reduce its rate. The last one for continuing service was $2.03 demand and 30.5¢ per Mcf commodity. Texas' 22.22¢ commodity

1. This section provides in pertinent part: "The provisions of this chapter shall not apply to any person engaged in or legally authorized to engage in the transportation in interstate commerce or the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities be subject to regulation by a State commission."

2. The volumes herein referred to are at 14.73 psia.

charge was thus 13¢ below CG&E's contract rate and more than 8¢ per Mcf less than its best offered rate.

Hamilton filed an application with the Commission under Section 7(a)[3] of the Act for authority to purchase its gas supply from Texas, and Texas applied under Section 7(c)[4] for authority to construct necessary facilities and to sell and deliver the supply of gas sought by Hamilton. Ohio Fuel filed a competitive application to be considered only if CG&E was discontinued as the supplier. It proposed to buy gas from Texas to sell to Hamilton. Interventions were permitted. The applications were consolidated for hearing and were heard by the Presiding Examiner on the evidence, and he handed down his Initial Decision upon the consolidated applications granting a Certificate of Public Convenience and Necessity to Texas, authorizing the sale of gas to Hamilton, and the construction of necessary facilities. The application of Ohio Fuel was denied. The Commission in a written opinion reviewed the Examiner's decision and adopted it to the extent not inconsistent with it own opinion.

There is no dispute about the fact that the Texas proposal would provide Hamilton with the lowest gas rate. Indeed, it was actually lower than CG&E paid its own suppliers. The controversy before the Commission centered on the extent of the benefits which would be derived by Hamilton under the Texas proposal, and whether they were outweighed by the impact on CG&E and its customers and suppliers occasioned by the loss of Hamilton as a customer.

The examiner found savings to Hamilton of at least $1,242,976 over a ten-year period. In addition he found evidence that Texas' low commodity rate would enable Hamilton to make additional industrial sales of 1,500,000 Mcf per year to two paper mills, and 1,600,000 Mcf to Hamilton's electric division, and that this would generate additional revenue of $100,000 per year. He found that the industrial sales would also reduce Hamilton's average cost of gas and thereby improve its load factor from the present 33% to an estimated 57%.

Hamilton also offered testimony that its economy required industrial development and that large industrial gas users could not very well be attracted with the high rates required under CG&E's proposals. The city had acquired an industrial park at a cost of about $500,000 in which to locate much needed new industries. Natural gas could be supplied to industries locating in the park with a minimum investment since the Texas delivery point is to be located in the industrial development area.

The Commission in reviewing the record found savings to Hamilton of $1,242,976 over a ten-year period, and that CG&E had conceded benefits in this amount. The Commission added an additional $800,000 in benefits resulting from a general reduction in Texas' demand charge, which it had ordered in another proceeding after the hearing. The Commission was also of the opinion that the lower rates offered by Texas would enable Hamilton to make increased industrial sales which would increase its profits by about $100,000 per year, or a total

---

3. Section 7(a), 15 U.S.C. § 717f(a) provides in part:
"* * * it [Commission] may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public * * *."

4. Section 7(c), 15 U.S.C. § 717f(c) provides in part:
"No natural-gas company * * * shall engage in the transportation or sale of natural gas, * * * or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations * * *."

of $1,000,000 in ten years. It stated, however, that there may be some question whether all of these benefits would be realized to the complete extent described, but that there was no question about minimum savings of $2,000,000 over the ten-year period.

But as we will point out later, there were other substantial benefits in addition to the minimum savings of $2,000,-000.

CG&E contended before the Board that the change would result in a loss to it over the ten-year period of $4,958,110, and that Ohio Fuel would lose $1.7 million in the same period. Both Examiner and Commission found no support for these claims in the evidence.

There was no doubt that the change in suppliers would have some adverse impact on CG&E and its suppliers, but the Commission found it was minimal. It found that CG&E under its last rate offer would gross only $12,002 per year in annual revenues in excess of its gas costs, and that these revenues were deficient by more than $148,000 annually to meet the full cost of service which CG&E was required to supply.

In this computation the Commission utilized CG&E's average cost of gas, which we think was proper. It was not required to base CG&E's cost of gas on certain low-cost gas which CG&E had proposed to purchase from Texas and Ohio Fuel. CG&E had not been authorized by the Commission to make such purchase and the Commission's action in this respect reflected its basic regulatory prohibition against the granting of preferences to individual customers or classes of customers. Furthermore, even if the

allocation of low-cost gas had been allowed, CG&E would still not earn an adequate rate of return. Thus, if its latest offer was accepted, CG&E would be furnishing gas to Hamilton at a loss.

In rates which it filed with the Public Utilities Commission of Ohio CG&E represented that it would not increase these rates prior to November 1, 1969, but after that time it would be free to do so. There is considerable doubt whether the Ohio Commission has any jurisdiction over the matter. State ex rel City of Hamilton v. Public Util. Comm., 10 Ohio St.2d 172, 226 N.E.2d 113 (1967).[5]

Texas' proposal, on the other hand, carried with it a twenty-year service contract, subject to Commission jurisdiction and rate regulation. CG&E's proposal was not subject to Commission jurisdiction, and the rates after 1969 necessarily depended upon bargaining between the parties. Hamilton contended that it would have no protection against any excessive charges which CG&E might demand and that it could not very well compete with CG&E in the sale of gas to industrial users if CG&E had the power to determine its rates in gas purchases.

In this connection the Examiner found that CG&E's latest proposed rates were so low in relation to the cost of providing the service as to justify fear on the part of Hamilton that such rates were not likely to be as stable as those of Texas. This observation finds support in CG&E's willingness to guarantee these rates only through November 1, 1969, and the fact that, as noted above, the full cost of service to Hamilton by CG&E exceeded its projected revenue from that customer.

5. This was an action in prohibition instituted by Hamilton against the Public Utilities Commission of Ohio, to prevent the Commission from considering an application filed before it by CG&E to fix rates. Subsequent to the filing of Hamilton's Section 7(a) application before the Power Commission, CG&E filed an action against Hamilton in the Common Pleas Court of Butler County, Ohio, seeking to enjoin Hamilton from discontinuing its purchase of gas from CG&E

without first obtaining approval of the Public Utilities Commission of Ohio. The Common Pleas Court in an opinion dated February 23, 1966, held that such approval was not necessary; the Court of Appeals affirmed, and the Supreme Court of Ohio dismissed the appeal. In the prohibition action the Supreme Court of Ohio granted the writ on the ground that the judgment of the Common Pleas Court was res adjudicata of the controversy.

The Commission further found that the minimal loss which CG&E would suffer initially would be completely absorbed by 1969 by increased sales, at a better load factor, to other customers, particularly in the rapidly growing areas of Fairfield and New Miami, Ohio. Actually, its customers will benefit from a reduction in their average cost of gas after 1968 and the elimination of Hamilton, which is a poor load factor. Furthermore, CG&E's lines serving Hamilton will be used to serve its other customers. Hamilton is willing to purchase from CG&E the metering stations now serving it.

Both the Examiner and the Commission were in agreement that the changeover would not require an increase in rates to CG&E's other customers and that they would not be substantially harmed. On the other hand, Hamilton represented to the Commission that savings realized by it would be passed on to its customers in the form of rate reductions.

But CG&E argues that it would make more money if Hamilton's purchases were included in its gross income and that the Commission erred in utilizing the figures of its average cost of gas. This contention overlooks the fact that the service to Hamilton under CG&E's last offer was at a loss. This loss ought not to be charged against CG&E's other customers in determining the reasonableness of their rates. Nor should Hamilton be deprived of the opportunity to purchase gas at a lower rate and thereby benefit its own customers when CG&E's customers were not substantially adversely affected.

■ CG&E further contends that the Commission should not have taken into account the yearly increases of its sales at a better load factor to other customers in rapidly growing areas. While we do not believe this should be the sole criterion, we think it was one of the factors which the Commission had a right to consider. It was so held in Lynchburg Gas Co. v. Federal Power Comm., 119 U.S.App.D.C. 23, 336 F.2d 943, 947–948 (1964).

■ Our discussion thus far has centered primarily upon the economic advantages and disadvantages accruing to the parties as a result of the Commission's order changing Hamilton's supplier. It was to this issue that the parties almost exclusively addressed themselves. But we think we should point out that the ultimate issue in a case of this nature goes beyond mere economics, to encompass the entire public interest.

■■ The primary aim of the Natural Gas Act was the protection of consumers. United Gas Improvement Co. v. Continental Oil Co., 381 U.S. 392, 402, 85 S.Ct. 1517, 14 L.Ed.2d 466 (1965); Federal Power Comm. v. Hope Natural Gas Co., 320 U.S. 591, 610, 64 S.Ct. 281, 88 L.Ed. 333 (1944); Kentucky Natural Gas Corp. v. Federal Power Comm., 159 F.2d 215 (6th Cir. 1947). In rate making the intent was that gas should be sold at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest. Fuels Research Council, Inc. v. Federal Power Comm., 374 F.2d 842, 852 (7th Cir. 1967); Atlantic Refining Co. v. Federal Power Comm., 115 U.S.App.D.C. 26, 316 F.2d 677, 678 (1963).

■■ What has happened here is the elimination of a middleman and the substitution of a direct supplier who had a nearby pipeline. The Commission had competing proposals to consider and necessarily had to adopt one and reject the other. The situation is somewhat similar to that which existed in Kentucky Natural Gas Corp. v. Federal Power Comm., supra. In that case we held that the existing supplier was not granted the exclusive right under the Act to continue to serve in a given area, and that the Commission had the right to grant a Certificate of Public Convenience and Necessity to a competitor. In that case the late Judge Shackelford Miller, Jr., who wrote the opinion for the Court, said:

"The elimination of an unnecessary middleman between the wholesaler and the retailer is a material benefit to the ultimate consumer at retail."

The Court also held that the ruling of the Commission could not be set aside unless it was arbitrary. To the same effect is the opinion written by Judge Maris in the Shrewsbury case. New England Power Co. v. Federal Power Comm., 349 F.2d 258 (1st Cir. 1965).

We find that there was substantial evidence to support the findings of fact of the Commission. They are binding on us. 15 U.S.C. § 717r(b); Universal Camera Co. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Cincinnati Gas & Elec. Co. v. Federal Power Comm., 376 F.2d 506 (6th Cir. 1967). There was a reasonable basis for the Commission's findings and they were not arbitrary. We think also that it applied the correct rules of law.

Our observations with respect to CG&E apply with equal force to the contentions of Ohio Fuel and KGT. We approve the Commission's findings that the change in suppliers will have no significant impact on them and that as with CG&E, their minimal loss will be completely absorbed in a short period of time by increased sales to CG&E. The Commission was correct in denying the application of Ohio Fuel.

Affirmed.